IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
HELENA DIVISION

| | | |
|---|---|---|
| ROBERT MEARS, | ) | CV 11-40-H-DWM |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | ORDER |
| | ) | |
| SAFECO INSURANCE | ) | |
| COMPANY OF ILLINOIS, | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

Plaintiff Robert Mears filed a claim for policy benefits with his insurer,

Defendant Safeco Insurance Company of Illinois ("Safeco"), after being hit by a

car while crossing the street. He eventually accepted a settlement offer of

$21,015.58 in exchange for his agreement to "release [Safeco] from liability under

the policy." The oral agreement was reached over the phone in a recorded

conversation. Mears subsequently signed off on a check from Safeco that

included the notation, "FULL AND FINAL SETTLEMENT OF ALL CLAIMS."

Eight months later, Mears learned from his doctor that he had severe stenosis and disc herniation in his back, a condition that required surgery and other treatment costing at least $150,000.  He now claims these back problems are related to the 2008 accident, and he seeks to set aside the telephonic release.  The only relief he wants at this time is a declaratory judgment.

There are currently six pending motions in the case: the parties' cross-motions for summary judgment and Defendant's motions to reopen the summary judgment briefing, to compel discovery responses, for leave to file discovery responses, and to exclude certain evidence from trial.  The motions are denied and granted as set forth below.

## STATEMENT OF FACTS

On September 18, 2008, Plaintiff Robert Mears was crossing the street outside the crosswalk when he was hit by a car driven by a high school student, Devin James Awbery.  He was hospitalized and treated for fractures of his right sacrum and right superior and inferior pubic rami (pelvic injuries) and the right transverse process of his L-5 vertebra.  He also suffered a bone bruise on his left leg, a sprained wrist, and broken teeth.  (Claims File, doc. 13-4 at 1, 10.)

At the time, Mears was insured with Safeco Insurance Company of Illinois ("Safeco").  His policy included medical payments coverage in the amount of

$1,000.00 and underinsured motorist coverage in the amount of $300,000.00.

(Aff. Vern Schneider, doc. 20-2, ¶ 5.)  Awbery's vehicle was insured by AIG.  (*Id.*

at  ¶ 14.)

Mears first contacted Safeco regarding the accident on April 26, 2009.  (*Id.*

at ¶ 7.)  His claim was assigned to two adjusters.  Either Kimmee Patawaran (*id.* at

¶ 8) or Michelle Galloway (Plaintiff's SUF, doc. 13 at ¶ 11; Letter to Mears from

Michelle Galloway, doc. 26-18) was assigned to handle Mears's claim for medical

payments coverage.  Vern Schneider was assigned to handle the claim for

uninsured or underinsured motorist coverage.  (Aff. Schneider, ¶¶ 8–9.)

Schneider and Mears first talked on May 18, 2009.  Schneider then took

Mears's recorded statement on May 20 or 21.  (Defendant's SUF, doc. 26 at 6 n.

1.)  Among other things, Mears explained that he had last sought medical

treatment for his injuries in December of 2008, that his back "gets stiff every once

in a while," and that he had not received treatment for that.  (Recorded Statement

of Robert Mears, doc. 26-17 at 25, 17.)  Schneider also learned that Mears had not

yet filed a claim with AIG, Awbery's insurer.  Schneider contacted AIG to initiate

the process and began his own investigation of the accident.  (Aff. Schneider, ¶¶

14–15.)

On July 18, 2009, Mears sent a hospital bill to Michelle Galloway at Safeco.

He stated that its balance was outstanding and he had been "paying on it as I can

afford." (Claims File, doc. 13-4 at 7.)  The statement indicated that the total

medical bill was $6,849.45, that insurance paid $4,512.09, that Mears had paid

$397.36, and that Mears still owed $1,850.00.  (*Id.* at 6.)

Ten days later, Safeco paid Mears the $1,000 limit available under his

medical payments coverage.  A letter accompanying the check stated:

> The policy limits of your Medical coverage are $1,000.00.  We issued
> a payment to you in the amount of $1,000.00 on July 28, 2009.  With
> that payment, your limits for this coverage were exhausted.  Under the
> terms of your current policy, we are unable to make any additional
> payments.   Bills for additional medical expenses will need to be
> submitted to your health insurance carrier.  Please send them a copy of
> this letter.

(Doc. 26-18.)  The payment was to reimburse him for medical expenses that his

health insurance had not covered.  (Claims File, doc. 13-4 at 11.)

On September 17, 2009, Mears settled his claim with AIG for the $25,000

limit of liability under that policy.  (Aff. Schneider, ¶ 17.)  He believes that he

signed a Release of All Claims, but insists that he did not understand he was

releasing the Awberys from further liability for the accident.  (Transcr. Depo.

Mears 127:20–128:11.)

Mears's underinsured motorist claim with Safeco was still pending when he

reached the deal with AIG.  Schneider valued the underinsured claim as having a

settlement value, before any deductions for other insurance payments and

comparative liability, of $37,500 to $47,500.  (Bodily Injury Evaluation, doc. 26-

16.)  After deducting $25,000 for the AIG payment and 30% to 70% for

comparative fault, he estimated a settlement range of $4,307.94 to $20,551.62.[1]

(*Id.*)  He noted that Mears's medical bills since the accident totaled $6,859.45, that

Mears had not received any medical treatment since December 2008, and that

"probable dental repair work remains outstanding."  (*Id.*)  He also noted that

Mears had not yet provided documentation of his medical bills or lost wages.  (*Id.*)

Mears and Schneider spoke on December 8, 2009, and Mears expressed

interest in settling his claim.  Schneider declined to make a settlement offer at that

time, stating he first need documentation of Mears's alleged lost wages and

additional medical bills and the settlement release with AIG.  (Aff. Schneider, ¶¶

19–20; Claims File, doc. 13-4 at 12.)  Mears emailed his medical bills and an

Earnings Statement to Schneider on January 3, 2010.  (Claims File, doc. 13-4 at 8.)

Later, he admitted in his deposition that he had not incurred any wage loss as a

result of the accident.  Depo. Mears, doc. 26-1 at 31.

Schneider left Mears a message to contact him on February 5, 2010, and

called again on February 8, 2010.  Some of the conversation was recorded, and the

transcription is copied in full below:

> VS: Okay.  Uh, this is Vern Schneider.  And today's date is February 8,
> 2010.  And the time is 1:40 p.m. Mountain Standard Time.  This is in

---

[1]Mears avers that Safeco valued his damages at $88,000 (e.g. doc. 29 at 2), but he does
not point to any part of the record that supports that assertion.

5

regard to the settlement of an underinsured motorist claim presented by Robert Mears. The prince, the company name is Safeco Insurance Company of Illinois. Okay. The underinsured motorist coverage section ... First of all, excuse me. Uh, Robert, do you understand that this conversation is being recorded?

RM: Yes.

VS: And is it with your permission?

RM: Yes.

VS: And would you state your name please?

RM: Robert L. Mears.

VS: Okay. According to our records, uh, the date of the accident was September 18, 2008, is that correct?

RM: That is correct.

VS: Okay. The underinsured, insured motorist coverage section of you policy obligates Safeco Insurance Company of Illinois, to pay for injuries you received in an automobile accident if an underinsured automobile driver is legally liable for them. You have made a claim against Safeco Insurance Company of Illinois, under the coverage, under that coverage, with respect to an accident which occurred on September 18, 2008 at Lewistown, Montana. Uh, involving a vehicle being driven by uh, (transcriber note: all proper names not spelled are typed as they sound) Devon James Alberry. Uh, we have investigated the accident and received information concerning your injures and are now in a position to make you an offer to settle your claim for bodily injury. We believe a payment of $21,015.58 would be fair. And we would offer to pay this amount to you in return for your agreement to release Safeco Insurance Company of Illinois from liability to you under our policy because of this accident. Is this an offer which you are willing to accept?

RM: Yes.

(Recorded Statement of Robert Mears, doc. 13-2.)  In addition, Schneider claims in his affidavit that "[i]t was [his] practice to confirm with an insured or claimant, before taking an oral release, that the individual understood that Safeco was paying money in exchange for a full and final release of all claims.  Only after receiving confirmation from the insured/claimant that he or she understood that the release was full and final would I initiate the recording."  (Aff. Mears, ¶ 25.)

Mears says he was driving at the time of the conversation.  (Aff. Mears, ¶ 23.)  He claims that the reception was bad, that his attention was divided, and that he did not hear everything Schneider was saying.  (*Id.* at ¶¶ 23–27.)  In particular, he denies hearing that the settlement was offered in return for his agreement to release Safeco from liability.  (*Id.*)  In contrast, Schneider and Safeco's transcriptionist report that they did not notice the reception was bad (Aff. Schneider, ¶ 24; Aff. Connie Corcoran, ¶¶ 7–8), and Schneider attests that Mears did not ask any questions and did not tell him that he was on the road, that his attention was divided, or that he could not hear or understand the conversation (Aff. Schneider, ¶ 24).

Safeco sent Mears a check for the $21,015.58.  (Claims File, doc. 13-4 at 14.)  "FULL AND FINAL SETTLEMENT OF ALL CLAIMS" was printed on the check between Safeco's address and the "Pay to the Order of" line.  (*Id.*)  Mears

claims he did not see the notation when he deposited the check. (Aff. Mears, ¶ 29.)

Eight months later, on October 23, 2010, Mears went to a chiropractor because of pain in his lower back. (Gallatin Valley Chiropractic treatment note, doc. 26-13.) He told Dr. Rising that the pain started after he worked on a chain-link fence the week before. (*Id.*) He also told the chiropractor that he had healed "100%" from being struck by the car in 2008 and that his doctor had "confirmed the fracture healed correctly." (*Id.*) Rising provided chiropractic treatment to Mears five additional times. In the six visits, Mears did not relate any of his symptoms to the accident nor did he suggest that his back pain started earlier than previously reported. Mears's last session with Rising was on November 5, 2010.

On October 29, 2010, Mears went to the emergency room because of perceived weakness and numbness in his leg. (Emergency Room Notes, doc. 26-14.) The doctor noted that Mears divulged that he "has never had a history of sciatica before" and that he had "recovered from [the 2008 accident] without any chronic pain issues." (*Id.*) The doctor diagnosed acute sciatica and referred him to Dr. Steven Speth, a surgeon. (*Id.*)

Dr. Speth performed an MRI, which revealed extruded disc fragments at L3-4, L4-5, and L5-S1. The severe stenosis and disc herniation required surgery, which was performed in November 22, 2010.

The additional chiropractic, surgical, and other medical care cost Mears approximately $150,000, but he did not submit the bills to Safeco for payment when they were incurred.  His attorney informed Safeco about the back surgery in December of 2010.

On February 28, 2011, Rising had a telephone conversation with Mears in order to obtain "a more clear history of the accident and condition."  Depo. Dustin Rising, doc. 39-1 at 17.  During this conversation, Mears told Rising that he had been experiencing low back pain every since the accident and that he had been managing the pain by taking up to 12 ibuprofen each day.  He also told Rising that he did not have any significant low back pain before the accident, that he did not have a history of back pain, and that he had been unable to fish or hunt since the accident.  In his deposition, Rising agreed that this information was totally different from what Mears had told him during the six treatment sessions in the fall of 2010 and from what Mears had written on his patient intake form.  Rising did not treat Mears following this phone call.

March 7, 2011, Rising wrote a letter to Mears's counsel opining that the September 2008 accident "was the primary cause of the injuries to his lower back that ultimately required surgery."  Doc. 13-5 at 2.  He further averred:

> Without a positive family history for severe spinal canal stenosis, there is no way that the patient could sustain such extreme stenosis without significant trauma. His disc herniation injury is consistent with the

> severe trauma sustained from his September 19, 2008, accident.  With
> no history of significant back pain prior to the accident, it was very
> likely the cause of the disc injury.

*Id.*  In the letter, he related information Mears provided in the February 28, 2011

phone call and described treatment and diagnoses Mears received after Rising's

last visit with him.

On January 27, 2012, Dr. Speth wrote a letter to Mears's attorney in which

he disagreed with Dr. Rising's conclusion, and stated that it was more likely that

Mears's back problems were the result of a "natural history of a degenerative

condition."  This letter was not produced by Mears in discovery.  Safeco found it

when Dr. Speth responded to a subpoena duces tecum.

**ANALYSIS**

**I.     Safeco's Motion in Limine (doc. 38)**

Dr. Rising did not comply with the expert witness disclosure requirements

under Federal Rules of Civil Procedure 26(a)(2)(B).  Consequently, Safeco seeks

to exclude any of his opinions that are based on information obtained outside the

course of treatment.

"[A] treating physician is only exempt from Rule 26(a)(2)(B)'s written

report requirement to the extent that his opinions were formed during the course of

treatment."  *Goodman v. Staples The Off. Superstore, LLC*, 644 F.3d 817, 826 (9th

Cir. 2011).  That is, his opinions must be based on his "personal knowledge of the

examination, diagnosis, and treatment of a patient and not [on] information acquired from outside sources." *Piper v. Harnischfeger*, 170 F.R.D. 173, 175 (D. Nev. 1997) (quoting *Mangla v. Univ. of Rochester*, 168 F.R.D. 137, 139 (W.D.N.Y.1996)). Where a party uses a treating physician to render expert testimony beyond the scope of the treatment rendered, and the physician considers information he did not review during the course of treatment, Rule 26(a)(2)(B) requires disclosure of written reports. *Goodman*, 655 F.3d at 826. This requirement is repeated in the Scheduling Order in this case, which also states that "[a]n inadequate report or disclosure may result in exclusion of the expert's opinions at trial even though the expert has been deposed." Doc. 10 at 6 (emphasis omitted).

Exclusion or limitation of expert testimony "is an appropriate remedy for failing to fulfill the required disclosure requirements of Rule 26(a)." *Yeti by Molly, Ltd. v. Deckers Outdoor Corp.,* 259 F.3d 1101, 1106 (9th Cir. 2001). "If a party fails to provide information or identify a witness as required by Rule 26(a)..., the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless." Fed. R. Civ. P. 37(c)(1). The party opposing the exclusion of such testimony bears the burden of establishing that the non-disclosure was substantially justified or harmless. *Yeti,* at 1107.

Mears did not seek Dr. Rising's opinion in February 2011 as part of his treatment. He had not seen Dr. Rising for over three months when they spoke on the phone, and he did not go in for treatment after their conversation. Nor did he seek advice about treatment or therapy during the phone call. He related entirely new information about the genesis and duration of his back pain and his later treatment with Dr. Speth, and he asked for Dr. Rising's opinions on the nature, extent, and cause of his back injuries. In essence, he was changing the medical history he had earlier given to Dr. Rising. Because the phone call lacked any treatment purpose, Mears's treatment with Dr. Rising ended with his last appointment with him on November 5, 2010.

A treating physician's opinion regarding causation may be excluded where the proponent of the testimony "presents no evidence, and [the court] finds none in the record, suggesting that [the] doctor previously considered or determined the cause of [the plaintiff's] injuries during the course of treatment." *Meyers v. Natl. R.R. Passenger Corp. (Amtrak)*, 619 F.3d 729, 735 (7th Cir. 2010). As in *Meyers*, there is no evidence here that Dr. Rising developed an opinion about the cause of Mears's injuries during the course of treatment except that he might have believed Mears hurt his back while working on the chain link fence. For example, in his deposition, Dr. Rising admitted that he believed when he was treating Mears that the injury and back pain were of recent origin. Doc. 39-1 at 22 ("I assumed it was

a week-long injury."). It is irrelevant that Mears, not his attorney, relayed the additional information to Dr. Rising and that Dr. Rising was not paid for his opinion. Dr. Rising was provided extensive information that he did not consider during the course of treatment, including Dr. Speth's treatment notes. *Goodman*, 644 F.3d at 826.

Because Dr. Rising relied on information obtained outside the course of treatment and his opinions extended beyond the treatment rendered, Rule 26(a)(2)(B) required disclosure of a written report. The opinions are not harmless omissions, and Mears's counsel provides no justification for failing to provide the required written and signed disclosure. Any opinions expressed by Dr. Rising after November 5, 2010, or based on information provided after that date, are inadmissible and excluded. *Goodman*, 644 F.3d at 826. This order precludes Dr. Rising from expressing any opinion about Mears's later symptoms, diagnoses, need for surgery,[2] and surgery, and any opinion that Mears's back problems were caused or aggravated by the September 2008 accident.

## II.   Cross-motions for summary judgment (docs. 12 and 24)

A party is entitled to summary judgment if it can demonstrate "that there is no genuine dispute as to any material fact and the movant is entitled to judgment

---

[2]Dr. Rising is also precluded from offering an opinion on whether Mears needed surgery because he acknowledged in his deposition that he does not have expertise in orthopedic surgery and would defer to orthopedic surgeons on the need for surgery.

as a matter of law." Fed. R. Civ. P. 56(a).  Where the documentary evidence

produced by the parties permits only one conclusion, summary judgment is

appropriate.  *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 251 (1986).  A

settlement agreement does not have to be in writing if it can be performed within a

year.  *Hetherington v. Ford Motor Co.*, 849 P.2d 1039, 1042 (Mont. 1993)); Mont.

Code Ann. § 28-2-903.

Mears asks the Court to find that the 2008 telephonic release is

unenforceable or is subject to rescission.  He cites a number of grounds—

intoxication, undue influence, economic duress, leveraging, mutual mistake of

fact, contextual confusion (he alleges he could not hear, concentrate on, or

understand the agreement because he was driving), and ambiguous contractual

language.  Both parties seek summary judgment on these issues.

Safeco is entitled to summary judgment on all Mears's arguments except

one.  There is a factual dispute over when Mears's back problems arose and

whether they were caused or exacerbated by the 2008 accident.  These issues are

material to Mears's theory that the parties entered the agreement under a mutual

mistake of fact.  Summary judgment is unwarranted at this point.

### A.     Mears was capable of contracting at the time he entered the settlement agreement, and he freely gave his consent unless both parties entered the agreement under a mutual mistake of fact.

It is a question of law whether an agreement constitutes a valid, express

14

contract. *Lockhead v. Weinstein*, 81 P.3d 1284, 1286 (Mont. 2003) (citation

omitted). For a contract to be valid, the parties must be capable of contracting and

must give their consent. Mont. Code Ann. § 28-2-102.

### 1. Mistake of fact

A contract may be rescinded if the parties' consent was based on a mutual

mistake of fact. Mont. Code Ann. § 28-2-401(1); *Kruzich v. Old Republic Ins.*

*Co.*, 188 P.3d 983 (Mont. 2008).

> Mistake of fact is a mistake not caused by the neglect of a legal duty
> on the part of the person making the mistake and consisting in:
> (1)     an unconscious ignorance or forgetfulness of a fact, past or
>         present, material to the contract; or
> (2)     belief in the present existence of a thing material to the contract
>         which does not exist or in the past existence of such a thing
>         which has not existed.

Mont. Code Ann. § 28-2-409. In contrast, parties are bound by their agreement if

they merely underestimated the future severity of an injury or failed to predict a

future event or condition. *Kruzich*, 188 P.3d at 988.

Mears argues that the oral settlement agreement should be rescinded

because his back problems, which were diagnosed in October 2010, existed before

or at the time of the settlement agreement, neither he nor Safeco's agent,

Schneider, knew about the problems, and neither knew the accident had caused or

exacerbated problems other than those that had been diagnosed.[3]   (Docs. 5 at ¶ 23; 14 at 3, 8–9.)

For the mutual mistake argument to have legs, the back problems Mears was diagnosed with in October 2010 must have been present at the time the settlement agreement was reached in February 2010.  *Weldele v. Medley Dev.*, 738 P.2d 1281, 1283 (Mont. 1987) (permitting rescission because the syndrome the plaintiff was diagnosed with after the parties reached a settlement agreement was consistent with symptoms that existed at the time of the agreement, but was difficult to diagnose); *Kimes v. Charlies Family Dining & Donut Shop*, 759 P.2d 986, 988 (Mont. 1988) (permitting rescission where x-rays showed that an undiagnosed tear in the plaintiff's medial meniscus was present at the time of the settlement); *compare Kruzich*, 188 P.3d at 987–88 (holding that where the Plaintiff developed Parkinson's disease several years after reaching a settlement agreement, the parties were not under a mistake of fact that existed at the time of their agreement).  Also, it must be more probable than not that the medical condition he complains about was caused or exacerbated by the September 2008 accident.  *Weldele*, 738 P.2d at 1283.; *Kienas v. Peterson*, 624 P.2d 1, 2 (Mont. 1980) (permitting rescission based on a finding that the parties were unaware that the accident at issue could have

_____

[3]Mears argues in response to Safeco's motion to reopen the summary judgment briefing that the cause of his back injuries is irrelevant.  However, his mistake-of-fact argument relies on the back problems resulting from or being exacerbated by the car accident.

aggravated the claimant's pre-existing cerebral palsy).

The parties dispute both the timing and cause of Mears's back problems. On one hand, Mears saw a chiropractor for "soreness" and "fatigue" in his back prior to the accident (Transcr. Depo. Mears 38:8–39:9, doc. 26-1), and he complained of back stiffness in his initial recorded conversation with Schneider in May 2009, although he appears to have attributed the stiffness to his diagnosed pelvic injuries or fractured L-5 vertebra. He also mentioned that he needed treatment for his back in an email to Schneider on January 3, 2010, just a little over a month before they entered the settlement agreement. (Claims File, doc. 13-4 at 8 ("I have no bills for the tooth work *and my back* as I have been paying off the other medical bills...") (emphasis added). These factors suggest his back injuries were present at the time of the settlement agreement, but attributable to an undiagnosed problem.

On the other hand, the medical evidence does not indicate either stenosis or disc herniation was present at the time of the settlement agreement, and Safeco's "Bodily Injury Evaluation" notes that Mears "denie[d] back or knee injuries." (Doc. 26-16 at 1.) Mears also stated in his deposition that he did not have the pain before October of 2010, and he did not seek treatment for back pain until then—eight months after the settlement agreement was reached and two years following the accident. Moreover, he initially told his chiropractor that he was

"100%" healed from the accident and attributed the pain to work he had done on a chain link fence the week before. These factors suggest the back injuries were not present at the time of the settlement agreement.

Considering this proof, it is evident the parties dispute material facts, even without considering the letter from Dr. Speth or the letter from Dr. Rising. Both motions for summary judgment on the question of setting aside the release are denied because the parties may have entered the agreement under a mutual mistake of fact.

### 2. Intoxication

Mears argues that he was incapable of contracting at the time of the settlement agreement because he was under the influence of pain medication that rendered him unable to understand and appreciate the effect of the release. (Doc. 5 at ¶¶ 20, 25.) A contract may be voidable if a party was so far under the influence of an intoxicant that he was incapable of giving his consent. *Babcock v. Engel*, 194 P. 137 (Mont. 1920).

Safeco seeks summary judgment on this issue, stating that Mears has produced no evidence that he was using pain medication at the time, much less that pain medication hampered his ability to understand the nature and consequences of his agreement. (Doc. 25 at 21.) Safeco also notes that Mears's medical records indicate he was last prescribed muscle relaxants and painkillers in

2008, but the agreement was entered in 2010.  (Doc. 15.)

Mears did not respond to this argument or offer any evidence in support of his allegation that he was incapable of contracting.  He has not met his burden to cite to parts of the record that demonstrate the presence of a genuine dispute.  Fed. R. Civ. P. 56(c).  Accordingly, summary judgment as to this issue is granted in favor of Safeco.

### 3.  Duress, undue influence, and leveraging

Mears insists that he was induced to enter the release against his will through economic duress, undue influence, or leveraging.  (Docs. 5 at ¶ 29; 14 at 13.)  He states that he told Schneider that he was struggling to pay his medical bills and that he needed to have his teeth fixed but could not afford it.  (Doc. 14 at 4.)  He claims he believed that if he did not agree to the settlement, Safeco would not send him any money, and he did not feel he was in a position to negotiate. (Doc. 13-1.)  Consent is not freely given if it is obtained through duress or undue influence. § 28-2-401(1).

Economic duress is defined as: "1) a wrongful act that; 2) overcomes the will of a person; 3) who has no adequate legal remedy to protect his interests." *Hughes v. Pullman*, 36 P.3d 339 (Mont. 2001) (citing *Hoven v. First Bank (N.A.)-Billings*, 797 P.2d 915, 919 (Mont. 1990)).

A claim of economic duress requires a showing that the contract at issue

19

was made under circumstances evincing a lack of free will on the part
of the contracting parties.  It is not sufficient to show that consent was
secured by the pressure of financial circumstances.

*Hoven*, 797 P.2d at 919 (refusing to permit rescission of a release because the

evidence showed the plaintiff "was pressured only by his need for further credit,

not by any duress imposed by [the lender]") (citation omitted).  If the party

claiming economic duress shows no evidence of a wrongful act by the other party,

the claim fails.  *Id.*; *Stanley v. Holms*, 975 P.2d 1242, 1248–49 (Mont. 1999)

(finding no evidence that any undue pressure was exerted on Holms to sign the

release and any economic pressure was of Holms's own making).

Here, the economic pressure experienced by Mears was not caused by

Safeco.  Mears had received a $25,000 settlement from AIG and $1,000 from

Safeco for his medical payment coverage, which he admitted was "more than

enough" to pay his medical bills, which were no more than $8,384.85.[4]  There is

no evidence that Safeco urged Mears to accept the settlement quickly, without

asking any questions or consulting with his wife or attorney, or that Safeco

suggested the offer was not negotiable.  Nor is there evidence of any other

wrongful act.

---

[4]Mears asserts he submitted medical bills to Safeco totaling $8,384.85 (doc. 14 at 5),
Schneider calculated his medical specials at $7,746.41 (Claims File, doc. 13-4 at 13), and Safeco
states that as of December 2009, Mears's medical bills totaled $6,859.45, of which Mears's
health insurer had paid $4,612.09 (doc. 25 at 24).

To establish a claim of undue influence, Mears must show that Safeco "[took] an unfair advantage of [his] weakness of mind; or [took] a grossly oppressive and unfair advantage of [his] necessities or distress" for the purpose of obtaining an unfair advantage over him.  Mont. Code Ann. § 28-2-407.  The opportunity to exercise undue influence is not sufficient; it must be correlated with alleged acts of influence.  *In re Estate of Lightfield*, 213 P.3d 468 (Mont. 2009).  "The influence must be such as to destroy the free agency of the influenced person with the will of another substituted."  *Valley Bank of Ronan v. Hughes*, 147 P.3d 185, 194–95 (quoting *Heintz v. Vestal*, 605 P.2d 606, 608 (Mont. 1980)).

The defendant in *Hughes* made a similar argument to the one advanced by Mears.  He contended that the plaintiff "exercised undue influence by utilizing his knowledge of Hughes' assets and took unfair advantage of Hughes' apparent distress over the situation in order to gain a legal advantage over Hughes."  *Id.* The Court found, however, that whatever influence the Bank may have exerted, it did not rise to the level of substituting its will for Hughes's.  Similarly, there is no evidence of unfair advantage here, and Mears has not alleged specific acts of influence, other than that Schneider was nice to him.  "Mere suspicion that undue influence may have or could have been brought to bear is not sufficient."  *In re Estate of Harmon*, 253 P.3d 821, 827 (Mont. 2011).

Mears also insists that the release constituted illegal leveraging under

Montana Code Annotated § 33-18-201(13) and was thus coercive.  Mears

emphasizes that Schneider knew Mears needed additional dental work and that he

was postponing this treatment while paying off his other medical bills.  He claims

he did not think Safeco would pay him at all if he did not accept the offer and

agree to the release.  Presumably, he is arguing that the desired dental work

constituted a disputed claim, and his other medical bills constituted an undisputed

claim.

Leveraging of undisputed claims in order to settle disputed claims is

prohibited under the Unfair Trade Practices Act, *Ridley v. Guaranty Nat. Ins. Co.*,

951 P.2d 987, 993 (Mont. 1997) (citing Mont. Code Ann. § 33-18-201(13)), and

leveraging cases have held that an insurer must pay undisputed medical expenses

before final settlement if liability is reasonably clear, *id.* at 992; *Etter v. Safeco*

*Ins. Co. of Ill.*, 192 F.Supp.2d 1071, 1073–74 (D. Mont. 2002); *compare Jacobsen*

*v. Allstate Ins. Co.*, 351 Mont. 464, 470–71 (2009) (insurance company does not

have a legal duty to advance lost wages).  This is because "the financial stress of

being unable to pay medical expenses can lead to the ill-advised settlement of

other legitimate claims in order to secure a benefit to which an innocent victim of

an automobile accident is clearly entitled."  *Id.* at 993.

Here, Mears had already accepted $26,000 in payments from AIG and

Safeco's medical payments coverage, which far exceeded his medical expenses

and other documented losses stemming from the accident.  Underinsurance

coverage is designed to "provide indemnification for accident victims when the

tortfeasor does not provide adequate indemnification."  *Augustine v. Simonson*,

940 P.2d 116, 120 (Mont. 1997).  AIG, the tortfeasor's insurer, had provided

settlement money to cover Mears's medical bills and other documented losses.

Mears cites no case law supporting his argument that an insurer providing

underinsurance coverage must advance-pay medical expenses that have already

been covered by the tortfeasor's insurer.

Nor has Mears shown that Safeco failed to pay for one type of damages for

which liability had become reasonably clear in order to influence the settlement of

disputed claims.  *Id.* at 994.  Mears did not provide documentation of most of his

medical bills or his alleged lost wages until one month before the settlement

agreement at issue.   There is no evidence Safeco then rushed the offer or forced

Mears to accept it in order to avoid liability for potential dental treatment.

Having shown no wrongful act, Mears has failed to support his claim that he

was coerced into agreeing to the release through undue influence, economic

duress, or leveraging.  Safeco is entitled to summary judgment as to these theories.

### 4.  The circumstances surrounding the contract

Mears also argues that he could not consent to the release because under the

circumstances of the phone call, he could not hear or understand everything that

was said.  In particular, he insists he did not hear or understand that he was

agreeing to release Safeco from any further liability for the accident.

A party to a settlement agreement is bound if he manifested assent to the

agreement's terms and did not manifest an intent not to be bound.  *Hetherington*,

849 P.2d at 1043.  There is no proof Schneider had any reason to suspect that

Mears was having trouble hearing or that he was confused.  The reception on

Schneider's end was good, and Mears answered his questions clearly and

appropriately.  Mears did not inform him that he was driving, that the reception

was bad on his end, or that he could not understand what was being said.  Mears

also apparently consented to the release.  Schneider stated:

> ... And we would offer to pay this amount to you in return for your
> agreement to release Safeco Insurance Company of Illinois from liability
> to you under our policy because of this accident.  Is this an offer which
> you are willing to accept?

Mears responded, "Yes."  Mears's failure to ask Schneider for clarification or to

repeat the offer "estop[s] him from avoiding the agreement on the ground he was

ignorant of its contents."  *Carlson v. N. Pac. Ry. Co.*, 268 P. 549, 553 (Mont.

1928) (holding that an illiterate releasor's failure to obtain a reading and

explanation of the contents of a release was "gross negligence" and did not permit

him to rescind the agreement).

In summary, unless both parties were under a mutual mistake of fact at the

24

time they entered the agreement, Mears was capable of consent and ultimately gave it.

**B.     The oral settlement agreement and the check Mears deposited were neither vague nor ambiguous.**

Mears argues the contract is unenforceable because it is vague and ambiguous.  Specifically, he argues Schneider did not define "bodily injury," did not identify what type of damage the payment was for or the coverage under which it would be made, and did not specify what rights Mears would be giving up.

A settlement agreement is binding if both the offer and acceptance are unconditional, and there is mutual consent on all essential terms.  *Murphy*, 270 P.3d at 74 (citations omitted).  "The two material or essential terms of a settlement agreement [are] 1) the amount of the settlement and 2) the release of all claims." *Id.* (citing *Hetherington*, 849 P.2d at 1043).  If a party manifested assent to these terms and did not manifest an intent not to be bound, the agreement is binding.  *Id.* A party's "latent intention not to be bound" does not prevent the formation of a binding contract.  *Id.*

The law of contracts determines the validity of a release.  *Hanson v. Oljar*, 752 P.2d 187, 189 (Mont. 1988).  Where the language of a release is clear and unambiguous, the language is applied as written—or, in this case, as recorded. *Rich v. Ellingson*, 174 P.3d 491, 495 (Mont. 2007).  A releasor's intent not to

release all claims, if not communicated to the other party, cannot change the obvious intent of the release. *Hanson*, 752 P.2d at 190 (declining to consider releasor's alleged intent that release not be full and final even though she may have had injuries related to an automobile accident for which she had not been compensated); *Richardson v. Safeco Ins. Co. of Am.*, 669 P.2d 1073, 1074 (Mont. 1983).

Here, Mears was "willing to accept" an offer to "settle [his] claim for bodily injury" for $21,016.58 in exchange for his agreement "to release Safeco Insurance Company of Illinois from liability to [him] under our policy because of this accident." (Doc. 13-2 at 1.)  Thus he agreed to the amount of the settlement and the release, the two essential elements of a settlement agreement.[5]  *Murphy*, 270 P.3d at 74.  Though the release does not name all the types of claims Mears was giving up—and though it could benefit from more detail—the language must be applied as written.  *Rich*, 174 P.3d at 495.  It is irrelevant that Schneider did not define "bodily injury" or explain that the payment was provided under Mears's underinsured motorist coverage.  Mears agreed to release Safeco from liability arising from the accident.  The release is general, including no exceptions.  Mears

---

[5]Though Mears does not raise this argument, it is possible that his acceptance was ambiguous because Schneider framed the offer conditionally: "Is this an offer you are willing to accept?" instead of "Do you accept this offer?"  However, any ambiguity in the phrasing is erased by Mears's subsequent negotiation of the check he received from Safeco.

did not reserve his right to raise future claims, unknown claims, or other claims.

He did not communicate his alleged intent that the release not be full and final.  In

return, he accepted payment.  Even if Mears had other injuries for which he had

not been compensated, the release is still effective, *Hanson*, 752 P.2d at 190,

unless it was entered into under a mutual mistake of fact.

Mears also insists that the agreement was ambiguous because Safeco had

earlier sent him a check for his medical payments coverage, which reflected that

the $1,000 was the maximum available "for this coverage."  (Claims File, doc. 13-

4 at 11.)  He contends that it was confusing that Safeco was making a second offer

of payment after saying that his medical payments coverage had been exhausted,

and that this might cause an average customer to think that a release was not in

fact full and final.  This extrinsic evidence cannot be considered because the

language of the release is unambiguous.  Even if it is considered, it does not

change the effect of the release.  The letter was limited to Mears's medical

payments coverage, and Mears understood that other coverage was still available

because he continued to work with Schneider to adjust his underinsured motorist

claim.  In contrast, after agreeing to the telephone release, he did not contact

Safeco again for nearly eleven months, when his attorney first informed Safeco

about Mears's back surgery.

Even if Mears thought there were exceptions or did not mean to agree to the

27

general release, the language on the check he received and deposited was even more explicit: "FULL AND FINAL SETTLEMENT OF ALL CLAIMS."  A settlement agreement including the language "IN FINAL AND COMPLETE SETTLEMENT OF ANY AND ALL CLAIMS" will be given effect to include all possible claims even if they are not specifically mentioned.  *Hohensee v. Chemodurow*, 470 P.2d 965, 967 (Mont. 1970).  Moreover, "signing a release is not necessary where parties indicate an intent to settle a claim and the check endorsed states that is for a full and final settlement."  *Eatinger v. Johnson*, 269 Mont. 99 (1994) (citing *Boyer v. Ettelman*, 767 P.2d 324, 327 (Mont. 1989).  In *Boyer*, the plaintiff was given a release form and a check with the notation that it constituted a full settlement of his claims.  767 P.2d at 327.  He refused to sign the release form, but he cashed the check, later denying that he noticed the full settlement notation.  *Id.*  The Montana Supreme Court held that, by cashing the check, he agreed to settle all his claims.  *Id.*  As in *Boyer*, Mears agreed to the general release when he deposited the check, even if he intended to cash the check but not agree to the release.

In summary, Mears agreed to release Safeco from liability for all claims arising from the accident.  He orally agreed to a general release over the phone without indicating any intent to reserve some rights, and he deposited the check that included the notation, "FULL AND FINAL SETTLEMENT OF ALL

CLAIMS," shortly thereafter.  His "latent discontent with the release cannot be grounds for alteration of an express agreement."  *Hanson*, 752 P.2d at 190 (internal quotation marks and citation omitted).  Thus, unless the parties were under a mutual mistake of fact, the release is valid.

### C.  Attorney fees are not recoverable.

Mears cannot recover attorney fees related to his summary judgment motion.  They are not allowable costs under Montana Code Annotated § 27-8-311, *Trustees of Ind. U. v. Buxbaum*, 69 P.3d 663, 670 (Mont. 2003), and § 25-10-303 does not apply because this is not "an action involving solely the recovery property damages arising out of the ownership, maintenance, or use of a motor vehicle."  Nor do the equitable or insurance exceptions to the American rule apply.  Mears was not forced into a frivolous lawsuit through no fault of his own, and instead of alleging that Safeco breached its duty to defend or indemnify him, he seeks to rescind the release or have it declared invalid.  *Jacobsen*, 351 Mont. at 470–71.  Because no exception applies and no statute provides for attorney fees in a case like this, attorney fees are not recoverable.

### III.   Safeco's motion to re-open summary judgment briefing (doc. 31)

Safeco seeks to re-open summary judgment briefing to include arguments concerning Dr. Speth's letter.  Because the letter would only contribute to the factual dispute over whether there was a mutual mistake of fact, the motion is

denied.  Dr. Speth's opinion letter would not overcome the facts in the record that support Mears's side of the issue.

## IV. Safeco's motion to compel discovery responses (doc. 34) and motion to file discovery (doc. 36)

Safeco seeks an order compelling Mears to supplement his responses and turn over documents in response to several discovery requests.  The motion is granted in part and denied in part, and because the discovery Safeco seeks to file in support of its motion to compel is not necessary to the Court's determination, that motion is denied as moot.

The definition of "relevant" under Rule 26(b)(1) "has been construed broadly to encompass any matter[s] that could bear on, or that reasonably could lead to other matters that could bear on, any issue that is or may be in the case." *Oppenheimer Fund, Inc. v. Sanders,* 437 U.S. 340, 351 (1978).  Even inadmissible evidence is discoverable if it is relevant and "reasonably calculated to lead to the discovery of admissible evidence."  Fed. R. Civ. P. 26(b)(1).

Mears contends the information Safeco seeks is not relevant to the issues before the Court.[6]

---

[6]Mears also argues that whether or not the telephone release is enforceable should be decided based upon the information collected by and known to the insurer at the time it settled the claim.  This argument does not make any sense given that the only reason the release may not be valid is if the parties entered the agreement under a mutual mistake of fact.  Consequently, what the insurer did not know at the time is critical.  Mears must prove that neither party knew at the time of settlement that the accident had caused or aggravated a different, undiagnosed injury that existed at the time they entered the agreement.

## A.    Medical information

Safeco's Request for Production No. 7 sought "[a]ll physicians', chiropractors', psychologists,' psychiatrists', physical therapists' or other healers' charts and records for a period commencing 10 years prior to the accident until the present."  Safeco received some of Mears's medical records and bills, but it has not received records for any treatment he received prior to the accident.

Mears's medical records—at least concerning his physical health—are relevant to the issue of whether his back injuries existed at the time of the agreement and possibly to the issue of whether the accident caused or aggravated the injuries.  Records from physician, chiropractor, physical therapist, and possibly other healer visits will help Safeco evaluate Mears's pre-accident medical condition.  However, psychiatric and psychological reports are not relevant based on the current issues and record.

## B.    Collection bills and notices and tax returns and supporting documents

Because Safeco is entitled to summary judgment on Mears's claim of economic duress, this information is no longer relevant, and Mears is not compelled to produce this information.

## C.    Letter of termination

Safeco argues that the termination letter goes to Mears's credibility and may

contain information regarding his surgery and perceived need for surgery. Construed broadly, this letter could be relevant, and thus Mears is compelled to produce it along with his medical records.

> **D.    Reasonable expenses including attorney fees and sanctions**

Both parties ask the Court to award them reasonable expenses in regard to their discovery dispute, including attorney's fees.  Because the motion is granted in part and denied in part, both parties are entitled to fees and must file affidavits supporting reasonable attorneys fees only relating to the discovery issues each prevailed on.

CONCLUSION

IT IS HEREBY ORDERED:

1.   Mears's motion for summary judgment (doc. 12) is DENIED.

2.   Safeco's cross-motion for summary judgment (doc. 24) is GRANTED in part and DENIED in part.  Summary judgment is granted in favor of Safeco on all issues except whether the parties entered the settlement agreement under a mutual mistake of fact.

3.   Safeco's motion to re-open summary judgment briefing (doc. 31) is DENIED.

4.   Safeco's motion in limine (doc. 38) is GRANTED.  The expert opinions of Dr. Rising based on information obtained outside of the course of treatment or

extending beyond the scope of the treatment rendered through November 5, 2010, are inadmissible.

5.   Safeco's motion to compel discovery responses (doc. 34) is GRANTED in part and DENIED in part.  Mears shall produce his letter of termination and any medical information that could be broadly construed to be relevant for impeachment purposes or for determining when Mears's back problems arose and whether they were caused by or exacerbated by the accident.

6.  Safeco's motion to file discovery (doc. 36) is DENIED as moot.

Dated this 29th day of August 2012.

DONALD W. MOLLOY, DISTRICT JUDGE
UNITED STATES DISTRICT COURT